JOURNAL ENTRY AND OPINION
Defendant-appellant, Luis McKeller, appeals the judgment of the Cuyahoga County Court of Common Pleas rendered after a jury verdict finding him guilty of murder and aggravated robbery. Appellant contends that he was deprived of his right to a fair trial because the trial court should have questioned all of the jurors about possible intimidation after one juror informed the court that she felt intimidated by a member of appellant's family. Appellant also contends that the trial court erred in sentencing him to consecutive sentences. For the reasons that follow, we affirm.
This case arose from a fatal shooting that occurred on July 28, 1999. Among the witnesses at trial, Jermaine Bowden testified that he arrived at appellant's house at approximately 11:00 a.m. on June 28, 1999. Appellant and Charles Bibb were sitting at the kitchen table discussing an easy robbery of Melvin Frazier, a drug-dealer, when Bowden arrived. According to Bowden, the men planned to rob Frazier of his drugs and money at the home of Denise Mills, which was a crack house where Frazier frequently did his drug deals. Bibb promised Bowden some of the drugs if he would tie up Frazier during the robbery. Bowden took a nylon stocking with him to put over his head during the robbery.
After Bibb paged Frazier and told him to meet him at the usual spot, appellant, Bibb and Bowden drove to the crack house. When they arrived, Bibb and Bowden went to a back bedroom to wait for Frazier. According to Bowden, appellant sat in the living room with Mills, her child, and Andrew Simmons, a neighbor of Mills. When Frazier arrived, he walked toward the back room. Bibb met him in the hallway and Frazier gave Bibb the drugs. Bibb then pulled out his gun and Frazier tried to run, but Bibb pulled him into the back room and began fighting with him. In the struggle, Bibb dropped his gun and Bowden picked it up.
Bowden testified that upon hearing the commotion, appellant came into the back room with his gun drawn. He wrestled Frazier to the floor, holding him down with his knee in his back and his gun on him. According to Bowden, Simmons then peeked his head in the door to see what was going on and Bibb pulled him into the room. Appellant then threw some cord at Bowden and ordered him to tie up Frazier. When Bowden refused, appellant ordered Simmons to tie up Frazier. Simmons tied up Frazier's legs and then appellant began going through Frazier's pockets. Bowden saw appellant take a nice knot of money out of Frazier's pockets and then Bibb left the room. Bowden testified that as he walked out of the room, he heard a gun go off. He looked back into the room and saw appellant on top of Frazier, with the gun pointed at his back. Appellant looked up, pointed the gun at Bowden, and said, Let's go. Bowden testified that appellant told him in the car after the shooting that he shot Frazier because he wouldn't be still.
Desmond Thompson testified that he played cards with appellant, Bibb and Bowden at appellant's house on June 28, 1999. According to Thompson, after the card game, appellant told him that he, Bibb and Bowden had lured Frazier to the drug house under the pretense of a drug deal but with the actual purpose of robbing him of his drugs and money. Appellant told Thompson that he had accidently shot Frazier and then gave Thompson his gun, which Thompson hid on top of a kitchen cabinet at his girlfriend's house.
In September 1999, appellant was apprehended in Honolulu, Hawaii, extradited to Cuyahoga County and indicted on two counts of aggravated murder and one count of aggravated robbery. The trial court dismissed count one of the indictment at the close of the State's case. The jury found appellant guilty of the lesser included charge of murder on count two and guilty of aggravated robbery on count three. The trial court sentenced appellant to serve a term of fifteen years to life for the murder conviction and five years for the aggravated robbery, both sentences to be served consecutively to each other and consecutively to a three-year firearm enhancement.
Appellant timely appealed, raising two assignments of error for our review. Appellant's first assignment of error states:
 I. THE TRIAL COURT ERRED BY FAILING TO CONDUCT A FULL VOIR DIRE HEARING OF THE JURY BASED UPON THE PERCEIVED INTIMIDATION BY ONE OR MORE OF THE JURORS DEPRIVED THE APPELLANT HIS RIGHT TO A FAIR JURY TRIAL.
During the trial, Juror Number 3 informed her sister, a secretary who works in the Office of the Cuyahoga County Prosecutor, that she felt intimidated by a spectator in the gallery. The secretary brought the information to the attention of the prosecutors on the case, who informed the trial judge.
Upon being apprised of this information, the trial judge voir diredJuror Number 3 in the presence of counsel for the parties and appellant. Juror Number 3 informed the trial court that as she was getting in her car one day after trial had concluded for the day, one of the men who had been watching the trial every day, seated on appellant's side of the courtroom, got into his car, which was parked next to hers. According to Juror Number 3, the man did not say anything or make any gestures but he kind of stopped a little bit when he saw her. Juror Number 3 testified that this encounter made her a little uneasy. She testified further that she saw this same man on another occasion as she was walking toward her car in the same parking lot. According to Juror Number 3, the man was in his car and kind of hesitated when he saw her, but did not say anything. When asked whether, in light of these incidents, she could be fair and impartial, Juror Number 3 responded, I don't know. Upon further questioning, Juror Number 3 informed the trial court that she had discussed the situation with one other juror. The trial court then excused Juror Number 3.
After the juror was excused, the trial judge observed that he felt that Juror Number 3 was not talking freely about the incidents because appellant was present during the voir dire. Appellant agreed to waive his right to be present during the voir dire and Juror Number 3 returned for further questioning.
When asked whether she had ever noticed the individual trying to make eye contact with her while she was sitting in the courtroom during trial, Juror Number 3 responded, Well, he looks, you know. If I happen to glance my eyes, sometimes he's looking. But a couple of the other jurors say the same thing. So I really don't just say he was directly staring at me, you know. That wouldn't be fair.
When questioned further regarding whether other jurors had made comments about people in the gallery intimidating them or staring at them, Juror Number 3 stated that only the previously named juror had mentioned one incident in which she had felt uncomfortable. Juror Number 3 stated that no one other than this juror had mentioned anything to her about feeling uncomfortable and she had not heard anyone else discussing it.
The trial judge then reassured Juror Number 3 that he did not believe that there was any reason to be concerned. He stated, I think that you all are new to this process. You're worried about it. And the nature of the case is such that you might be even more worried. But I think that nothing at all is going to happen. Juror Number 3 stated that the judge's reassurances had made her feel better and, in response to further questioning, stated that she could be fair and impartial.
After Juror Number 3 was excused, the trial judge commented that it did not appear that anything improper had occurred, but agreed that Juror Number 3 was worried. The trial judge commented further, But I'll bet every juror is worried. And I suspect there's been enough conversation, even about this, that it's just not affecting these two, but maybe, you know, the others.
The trial judge then voir dired the other juror. Upon questioning, this juror stated that as she was walking to her car, she had seen one of appellant's family members driving up the ramp of the parking lot. On another occasion, an automobile with several of appellant's family members had followed her car for several blocks as she was leaving the parking lot. The juror stated that after reflection, however, she concluded that she was simply being paranoid. She stated, like I said, after I thought about it, it was kind of silly. I was freaking myself out. It was just the fact that we're — just a coincidence that we all came up out of the parking lot together and traveled a few streets, that's all. But nothing has been said, or anything, from either party.
In light of the comments by Juror Number 3 that she had spoken with other jurors about her concerns and noting that there may be some self-induced paranoia with this whole jury, defense counsel moved for a mistrial. In the alternative, counsel requested that Juror Number 3 be excused for cause. The trial court denied both motions.
Before resuming trial, the trial court informed the entire jury that although they might be concerned because they had encountered members of appellant's and Frazier's family in the parking lot, the trial judge and counsel had investigated the matter and determined that nothing untoward had occurred and there was no reason to be concerned.
Appellant contends on appeal that the trial court erred in not conducting a voir dire hearing of each member of the jury. He asserts that the trial court was made aware by Juror Number 3 that the members of the jury were discussing their paranoia about seeing appellant's family in the parking lot and, therefore, he should have questioned all the jurors about any uncomfortableness they might be feeling. In the alternative, he asserts that the trial court erred in not excusing Juror Number 3 for cause.
When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communicationbiased the juror. State v. Phillips (1995), 74 Ohio St.3d 72,88, citing Smith v. Phillips (1982), 455 U.S. 209, 215-216; Remmer v. United States (1954), 347 U.S. 227, 229-230. In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror. Id.
Initially, we note that appellant did not request that the trial court individually voir dire each juror and, therefore, has waived all but plain error. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. To constitute plain error, the error must be obvious on the record, palpable and fundamental, so that it should have been apparent to the trial court without objection. State v. Ross (Oct. 12, 2000), Cuyahoga App. No. 77126, unreported, citing State v. Tichon (1995), 102 Ohio App.3d 758, 767. In order to warrant a reversal of his conviction, appellant must establish that the outcome of the trial would clearly have been different but for the trial court's allegedly improper actions. State v. Waddell (1996), 75 Ohio St.3d 163, 166. We find no such plain error here.
First, the record does not support appellant's assertion that any jurors other than the two jurors questioned by the trial court were concerned by or discussing any perceived intimidation by members of appellant's family. When questioned about this, Juror Number 3 — the only juror who brought the matter to the attention of the court — specifically stated that she had discussed her concern with only one other juror and that she had not heard any other jurors discussing the matter.
Moreover, after investigation, the trial judge determined that no intimidation had occurred. Juror Number 3 told the court that the man she saw in the parking lot did not say anything to her or make any gestures but simply hesitated a bit when he saw her. The second juror questioned by the court also stated that the man had not said anything nor had he made any gestures. Moreover, she stated that she realized that it was just her own paranoia that made her uncomfortable. In light of these statements, the court properly concluded that no one had attempted to threaten or intimidate any of the jurors. Thus, although the trial judge accurately observed that the nature of the case was likely making all the jurors somewhat uncomfortable, there was no reason to question any of the other jurors.
Appellant contends that this case is similar to State v. Moorehead (May 9, 1996), Franklin App. No. 95APA09-1116, unreported. In Moorehead, a sheriff's deputy overheard a conversation among six jurors while they were eating dinner. The jurors stated that friends and family members of the defendant had been making eye contact with them or had attempted to converse with them. Upon learning of the attempted communication, the trial court interviewed the six jurors. All of the jurors interviewed by the court stated that the attempted contacts would not influence their decision or intimidate them and, therefore, the trial court concluded that each could continue to serve on the jury.
Appellant asserts that as in Moorehead, the trial court should have interviewed all of the jurors to determine whether they felt intimidated. Appellant misconstrues Moorehead. The trial court in that case did not interview all of the jurors on the jury; as is stated repeatedly in the opinion, the trial judge interviewed all of the jurors involved in the attempted intimidation. Thus, Mooreheaddoes not support appellant's argument. Rather, Moorehead indicates that the trial judge did exactly the right thing: he interviewed the two jurors who had expressed concern about possible intimidation and, upon concluding that there had been no intimidation and that both jurors could continue to be fair and impartial, he allowed both to continue to serve.
We similarly find no merit to appellant's argument that Juror Number 3 should have been excused for cause. Upon extensive questioning, Juror Number 3 assured the trial court that she could be fair and impartial. A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court. State v. Phillips (1995),74 Ohio St.3d 72, 89. Accordingly, it was not mandatory to excuse Juror Number 3 from the jury, nor was it unreasonable not to do so.
Appellant's first assignment of error is therefore overruled.
Appellant's second assignment of error states:
 II. THE TRIAL COURT ERRED BY SENTENCING TO THE APPELLANT TO SERVE CONSECUTIVE SENTENCES BY (SIC) BASED UPON CONSIDERATION OF FACTS NOT SUPPORTED BY THE RECORD.
In his second assignment of error, appellant asserts that the trial court improperly sentenced him to consecutive sentences.
R.C. 2929.14(E)(4) provides that a trial court may impose consecutive prison terms for convictions of multiple offenses if the trial court finds that: 1) consecutive sentences are necessary to protect the public from future crime or to punish the offender; 2) the consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and 3) the offender committed the multiple offenses while awaiting trial or sentencing, or on probation or other post-release control for another offense; or the harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses adequately reflects the seriousness of the offender's conduct; or the offender has a history of recidivism and multiple terms are necessary to protect the public from future harm.
Pursuant to R.C. 2929.19(B)(2)(c), if the trial court imposes consecutive sentences, it must make a finding on the record that gives its reason for imposing consecutive sentences. The trial court clearly made such findings in this case.
First, the trial judge found that consecutive sentences were necessary to punish appellant and were not disproportionate to the seriousness of his conduct and the danger he posed to the public. Specifically, at the sentencing hearing, the trial judge noted the distinction between this case and a murder case that had been tried to him only six weeks prior in which he had sentenced the defendant to eighteen years to life in prison. The trial judge stated that in light of the fact that this case involved organized criminal drug activity and a murder committed basically in a cold-blooded fashion, in fashioning a sentence that is commensurate with the seriousness of the defendant's conduct and not demeaning to its impact on the victim, and comparing it to other kinds of cases that I am aware of, this case deserves more than eighteen years to life.
The trial judge concluded further that consecutive sentences were necessary because the harm caused by the multiple offenses was so great that no single prison term adequately reflected the seriousness of appellant's conduct. The judge stated:
 I think these two offenses have to be dealt with separately, so that a portion of this sentence represents what the seriousness of the robbery itself was and the other portion of it represents what the seriousness is of the death that resulted here.
* * *
 [T]he harm was so great and so unusual that not to identify both of these situations in which they occurred would itself demean the seriousness in which it happened. So, a killing in the course of a drug robbery, even if, as the jury found, not an intentional killing, ought to get more than simply the straight sentence for murder.
The judge reiterated these findings in the judgment entry of sentence:
 The Court finds that the harm caused by committing aggravated robbery in a drug offense and murder thereafter is so great that a sentence of 18 years to life alone for murder is not sufficient to denote the seriousness of defendant's total conduct.
 Drug-selling is an illegal business in which violence can be important to enforce obligations and in which the sellers themselves can be especially vulnerable to robbery. Not to impose a distinct and additional penalty for robbery of a drug dealer is, in effect, a condonation of such kinds of robberies. In this case the aggravated robbery was planned. The killing was coincidental and not intentional, but the shooting itself was intentional. Because there were two intentional crimes — aggravated robbery and felonious assault — but the killing arose primarily from the felonious assault, it is essential that a distinct message be sent that robberies, even of drug dealers, do not go unpunished. Consecutive sentences are, thus, necessary to punish the defendant and protect the public. Twenty-three years as a minimum sentence is not disproportionate to the seriousness of defendant's conduct and the danger that defendant poses to the public. If the killing had occurred only in an argument, the sentence would have been 18 years to life.
Accordingly, it is apparent that the trial judge followed the statutory mandates for imposing consecutive sentences set forth in R.C.2929.14(E).
Appellant admits that the trial court followed the statutory guidelines in imposing consecutive sentences but asserts that the trial court erred nevertheless because its findings were based upon an erroneous conclusion that appellant's offenses were the result of organized crime. We disagree.
First, the trial court did not find, as appellant asserts, that the crimes were committed as part of a criminal organization.Rather, the trial court found that the robbery was planned and, therefore, organized criminal activity:
 The evidence was that this was a planned robbery by people in the drug business, one drug dealer ripping off another drug dealer and, in the words of the statute, it was organized criminal activity, as set forth in Section 2929.12(B)(7) of the Code.
Moreover, contrary to appellant's argument, the judge considered appellant's organized criminal activity with respect to the amount of time appellant should serve for the aggravated robbery conviction, not with respect to whether appellant should receive consecutive or concurrent sentences. In explaining why he was sentencing appellant to more than the minimum sentence on the aggravated robbery conviction, the trial judge stated:
 You know, this is the 21st Century version of the 1920's, of prohibition, and whether it rises to the level of wanton Mafia or not, this level, I wouldn't dignify it with that, because I think it is basically all pretty crude behavior, but it isn't any less mean or vicious or organized or a part of what is tearing our society apart. So, if you look at one form of organized criminal activity as three kids deciding to break into a house, that's one thing, but this kind of organized criminal activity occurs in the context of what I call, what I will refer to as organized crime with quotation marks around it.
 So, I think, one of the questions that the Court has to deal with is how do we treat those kinds of robberies. It seems to me that they ought to be treated more seriously than one kid going into a store, * * * no past record, committing a robbery of a store keeper, because this is an industry out there, people who are engaged in unlawful activities and are planning to take care of each other, one way or another.
 So, I look upon this as the kind of offense that standing alone, without a homicide, the Court ought to give more than the minimum sentence, even to a first offender. Otherwise what we are saying to the other people who are in the drug business is go ahead, you can rip each other off, you can do whatever you want, we don't care, that's the cost of doing business, and I don't think that's the message that is properly communicated.
Accordingly, rather than sentencing appellant to the minimum three years on the aggravated robbery charge, the trial judge sentenced appellant to five years, plus three years for the firearm specification.
R.C. 2929.12 provides that unless a mandatory prison term is required, a trial judge has discretion in sentencing an offender. It further provides that among the factors the court should take into account when considering whether the offender's conduct is more serious than conduct normally constituting the offense is whether the offender committed the offense for hire or as a part of an organized criminal activity.
Here, the evidence demonstrated that the robbery was planned and coordinated. Appellant and his co-conspirators met together to discuss and plan the robbery. They planned and succeeded in luring the victim into a secluded home with the promise of a drug deal. They brought weapons and a disguise with them to help in their plan. On this evidence, the trial judge did not err in concluding that the robbery was an organized criminal activity and, therefore, in sentencing appellant to more than the minimum sentence on the aggravated robbery conviction.
Appellant's second assignment of error is therefore overruled.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, A.J. and TERRENCE O'DONNELL, J., CONCUR.